UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
CUTTING EDGE ENTERPRISES, INC.,     <u>MEMORANDUM DECISION</u>
                                            <u>AND ORDER</u>
                                            06 CV 667 (GBD)

                        Plaintiff,

     -against-

THE NATIONAL ASSOCIATION OF ATTORNEYS
GENERAL, et al.,

                        Defendants.
------------------------------------------------------------------------x
GEORGE B. DANIELS, District Judge:

       Plaintiff Cutting Edge Enterprises, Inc. ("Cutting Edge"), brought suit against The National Association of Attorneys General ("NAAG"),[1] and forty individual State Attorneys General, in their official capacities as Attorneys General,[2] and Robert Spagnoletti, in his official capacity as Corporation Counsel of the District of Columbia (the "Attorneys General," collectively with NAAG "Defendants"), seeking declaratory and injunctive relief for alleged

---

[1] NAAG is an unincorporated organization with its headquarters in the District of Columbia. Its membership is comprised solely of the attorneys general of all the states. It was founded in order to facilitate "interstate cooperation and policy research and analysis of legal and law enforcement issues." Memorandum of Law in Support of Defendant Attorney Generals' Motion to Dismiss (AG Motion to Dismiss) at 8.

[2] The individually named defendant Attorneys General are: Lawrence Wasden (Idaho), Tom Miller (Iowa), Troy King (Alabama), David W. Marquez (Alaska), Terry Goddard (Arizona), Mike Beebe (Arkansas), Bill Lockyer (California), John Suthers (Colorado), Carl C. Danberg (Delaware), Thurbert E. Baker (Georgia), Mark J. Bennett (Hawaii), Lisa Madigan (Illinois), Steve Carter (Indiana), Phill Kline (Kansas), Greg Stumbo (Kentucky), Charles Foti (Louisiana), G. Steven Rowe (Maine), J. Joseph Curran, Jr. (Maryland), Tom Reilly (Massachusetts), Mike Cox (Michigan), Mike McGrath (Montana), Jon Bruning (Nebraska), George J. Chanos (Nevada), Kelly Ayotte (New Hampshire), Peter C. Harvey (New Jersey), Patricia A. Madrid (New Mexico), Roy Cooper (North Carolina), Jim Petro (Ohio), W. A. Drew Edmondson (Oklahoma), Hardy Myers (Oregon), Tom Corbett (Pennsylvania), Henry McMaster (South Carolina), Larry Long (South Dakota), Paul G. Summers (Tennessee), Mark Shurtleff (Utah), William H. Sorrell (Vermont), Judith W. Jagdmann (Virginia), Rob McKenna (Washington), Darrell V. McGraw, Jr. (West Virginia) and Pat Crank (Wyoming).

violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Due Process[3] and Commerce Clauses[4] of the United States Constitution, and common law.  NAAG and the Attorneys General each filed motions to dismiss the complaint for lack of personal jurisdiction, lack of subject matter jurisdiction, and improper venue.  This Court does not have personal jurisdiction over Defendants.  Therefore, the motions to dismiss are granted.[5]

## BACKGROUND

On November 23, 1998, 46 States, the District of Columbia, Puerto Rico and four United States territories (the "Settling States") entered into a Master Settlement Agreement ("MSA") with the country's four largest tobacco companies (known in the MSA as the "Original Participating Manufacturers" or "OPMs").  Amended Complaint (Compl.) ¶ 14.  The MSA settled litigation brought by the Settling States against the OPMs to recover the costs incurred by the Settling States in treating smoking related illnesses.  Id.  The MSA's execution was the culmination of several months of extensive negotiations, which took place in New York City, between the Settling States and the OPMs.  Id.  To effect the dismissal of the various lawsuits, the trial court in each Settling State approved and entered a Consent Decree which was part of the MSA.  AG Motion to Dismiss at 5.  In exchange for a release and dismissal of the various claims, the OPMs (1) "agreed to a wide array of restrictions on advertising, promotion and

---

[3] U.S. Const. amend. XIV.

[4] U.S. Const. art. I, § 8, cl. 3.

[5] Because the Court holds that personal jurisdiction is lacking, the Court will not address Defendants' other arguments.

marketing of cigarettes"; and (2) "they agreed to make annual payments to the States in perpetuity." Id.

The MSA also provides that other tobacco manufacturers may join the MSA as Subsequent Participating Manufacturers ("SPMs," collectively with OPMs "Participating Manufacturers"). Id. at 6. SPMs are bound by the same public health restrictions of the MSA as OPMs and are also required to make the same annual payments to the Settling States. Id. All tobacco companies that become Participating Manufacturers "acknowledge[d] that the court that approved the Consent Decree in each State has exclusive jurisdiction for the implementation and enforcement of the MSA and is the only court to which disputes under the MSA or the Consent Decree as to that State can be presented." Id. (citing MSA § VII(a) and NAAG Declaration at ¶ 11).

Further, the MSA contained a model escrow statute that was enacted by each of the Settling States ("Escrow Statutes"). See MSA Ex. T. Under these Escrow Statutes, a cigarette manufacturer that does not wish to join the MSA could still sell cigarettes as a Non-Participating Manufacturer ("NPM"), provided it makes deposits into state escrow accounts on a flat per-cigarette basis. AG Motion to Dismiss at 6. The escrow accounts have two purposes: first, they provide a resource from which any judgment brought by a state against a NPM can be satisfied; and second, they prevent NPMs from enjoying the benefit of selling cigarettes without sharing in the costs that cigarette smoking imposes on the state. Id. at 7.

After the MSA was executed and the Escrow Statutes were enacted by the Settling States, states began enacting directory statutes (the "Directory Statutes").[6] Each defendant state has

---

[6]The Directory Statutes are sometimes also referred to as "contraband statutes."

enacted a directory statute. Id. The Directory Statutes were not part of the MSA and there was no model directory statute negotiated during the MSA negotiations. Id.; Compl. ¶ 10. Under these statutes, each state is required to create and maintain a state directory listing all of the cigarette manufactures entitled to sell cigarettes in that respective state and the brands of cigarettes certified for sale. AG Motion to Dismiss at 7. Generally, these Directory Statutes require a tobacco manufacturer wishing to be listed on a State's directory to certify that it is either (1) a Participating Manufacturer in compliance with its MSA payment obligations, or (2) a NPM that is in compliance with that State's Escrow Statute. Id. at 8. To establish its conformance with one of these requirements, a cigarette manufacturer must provide each respective state with certain particularized information. States may also, pursuant to their Directory Statutes, request further information from manufacturers "when warranted." Id.

Although it is not a party to the MSA and has no authority to enforce the MSA's terms, see AG Motion to Dismiss at 9,[7] NAAG has, since the MSA's inception, maintained a list of companies that have become Participating Manufacturers to the MSA on the NAAG website. Id. Unlike the state Directory Statutes, however, NAAG's directory "has no legal significance and is not binding on the States or other MSA Parties." Id. (internal citation omitted); see also Memorandum of Law in Support of Defendant NAAG's Motion to Dismiss (NAAG Motion to Dismiss) at 3.

Cutting Edge was incorporated in Maryland on May 11,1998, and joined the MSA as an

---

[7]NAAG is, however, a "notice party" to the MSA, see MSA § II (ee), and it is assigned certain tasks under the MSA, such as coordinating and supporting the efforts of its members in carrying out their duties under the MSA. See, e.g., id. at §§ VII & VII; AG Motion to Dismiss at 9.

SPM in December 2000. Compl. ¶ 17. On March 16, 2005, before Cutting Edge had sold any cigarettes, its founder sold the stock in the company to Windy City Tobacco, LLC. Id. at ¶ 18. About a week later, on March 22, 2005, counsel for Cutting Edge formally requested that two new Cutting Edge-brand cigarettes be added to the NAAG website. Id. at ¶ 19. NAAG declined to do so. Id. Over the next several months, Cutting Edge continued its efforts to obtain listing on the NAAG website and on state directories to no avail.[8] See id. at ¶¶ 19-22. Ultimately, its efforts to secure the listing of Cutting Edge-brand cigarettes on the NAAG website and on several state directories failed.[9] Id. at ¶ 23. Cutting Edge then instituted this lawsuit seeking declaratory and injunctive relief for alleged violations of Section 1 of the Sherman Act, the Due Process and Commerce Clauses of the United States Constitution, and common law.

Both NAAG and the Attorneys General moved to dismiss the complaint for lack of personal and subject matter jurisdiction, and for improper venue.

**PERSONAL JURISDICTION**

Defendants move to dismiss the amended complaint for lack of personal jurisdiction.

---

[8] The owner of Windy City, Cutting Edge's parent, transferred his equity in Windy City to the current owner, Mr. Calvin Phelps, Sr., in January 2006. Compl. ¶ 21.

[9] According to Defendants, there were serious questions about the true ownership of Cutting Edge, and whether the owners were attempting to sell NPM-brand cigarettes as Cutting Brand-cigarettes in an effort to circumvent the state Escrow Statutes. See Transcript of Oral Argument ("Tr.") at 27-29. Thus, many states requested more information from Cutting Edge, and a working group was formed specifically to coordinate the gathering of information from Cutting Edge. Tr. at 28. While the states were continuing their due-diligence, NAAG declined to list any purported Cutting Edge-brands on its website. Id. The Defendants maintain that Cutting Edge has still not provided all the information requested of it. AG Motion to Dismiss at 20. It is for these reasons, Defendants maintain, Cutting Edge was not listed, and is still not listed, on the NAAG website or on state directories.

"District courts resolving issues of personal jurisdiction must engage in a two-part analysis." Grand River Enterprises Six Nations v. Pryor (Grand River), 425 F.3d 158, 165 (2d Cir. 2005) (citation and alteration omitted). First, the court must determine whether there is jurisdiction over the defendant under the law of the state in which the district court sits. Id. If jurisdiction does exists under the relevant state law, the court must then determine whether exercising jurisdiction would be consistent with federal due process requirements. Id. The burden is on the plaintiff to establish that personal jurisdiction exists, see, e.g., Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999), and when the court chooses "not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials" to satisfy its burden. Bank Brussels Lambert v. Fiddler, Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999) (citation omitted).

Here, of course, the relevant state law is New York's, and, in particular, New York C.P.L.R. § 302(a)(1), New York's "long-arm statute."[10] See, e.g., Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). Section 302(a)(1) "provides that a court may exercise personal jurisdiction over any foreign defendant if that defendant 'transacts any business

---

[10] Plaintiff does not argue that Defendants have "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of [their] 'presence' in this jurisdiction." Landoil Resources Corp. v. Alexander & Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (citations and internal quotation marks omitted). Therefore, jurisdiction cannot be exercised pursuant to C.P.L.R § 301. Id.; N.Y. C.P.L.R. § 301; see also Croskey v. Medical and Technical Services, Inc., 05 Civ. 6641, 2006 WL 2347816, *3 (S.D.N.Y. Aug. 10, 2006) ("N.Y. C.P.L.R. 301 establishes general jurisdiction over a non-domiciliary defendant engaged in a continuous and systematic course of doing business in New York.") (citation and alterations omitted).

within the state,' and the claim arises from those business transactions." Id. (citing N.Y. C.P.L.R. § 302(a)(1)). "A non-domiciliary 'transacts business' under C.P.L.R. § 302(a)(1) when he *purposely avails* himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of New York's laws." Grand River, 425 F.3d at 166 (citations and alterations omitted) (emphasis in the original).

In this case, the amended complaint alleges that jurisdiction exists because "Defendants negotiated, agreed to, and signed the MSA in this District." Compl. ¶ 7. It further alleges that "MSA payments are held in escrow in this District and the MSA Escrow Court is a Court of the State of New York." Id. The issue then is whether this activity amounts to "transacting business" under § 302(a)(1). In Grand River, the Second Circuit held that it does: "the extensive New York negotiations over the MSA and model escrow legislation language, and the agreement's ultimate execution in New York, satisfy § 302(a)(1)'s transacts-any-business requirement." Grand River, 425 F.3d at 166.[11]

The Attorneys' General, however, contend that Grand River "is distinguishable because the claims in that case were fundamentally different from the claims at issue here." AG Motion to Dismiss at 13. But in analyzing the transacts-any-business requirement, what matters is the activity alleged to have occurred in New York—here the negotiation and execution[12] of the

---

[11]NAAG maintains that it is not a party to the MSA and that it was not part of the MSA negotiations in New York. But the issue is mooted because, as discussed below, the Court finds that Cutting Edge's claims do not arise from the negotiation of the MSA in New York, and the amended complaint must therefore be dismissed.

[12]The Attorneys General also argue that in Grand River, the Second Circuit mistakenly believed that the MSA was executed in New York when in fact it was not. See AG Motion to Dismiss at 16-17. The execution of the MSA was indeed a factor in Grand River, but the court's emphasis on the extensive negotiations in New York indicates that jurisdiction would have been

MSA—and not the nature of the claims being asserted.  Indeed, whether the claims here differ fundamentally from the claims in Grand River is relevant only to whether the claims arise out of the transaction of business.

They also argue that here, unlike Grand River, the parties are bound by the MSA's forum selection clause.  Id. at 14.  The forum selection clause in the MSA, however, gives the court that approved and entered the Consent Decree for each Settling State exclusive jurisdiction to enforce the MSA and the Consent Decree only.  MSA § VII (a).  It says nothing about enforcement of the Directory Statutes; nor could it, because these statutes were not part of the MSA and were not enacted until years after the MSA's execution.  Thus, the forum selection clause in the MSA does not control the forum in which Cutting Edge can assert its claims.

The determinative issue is whether the Sherman Act claim arises out of the negotiation of the MSA in New York.[13]  "To meet the 'arising out of' requirement of N.Y. C.P.L.R. § 302(a),

---

upheld even without the formal execution taking place in New York.  See Grand River, 425 F.3d at 166.  Even if Defendants are correct in that the MSA was not executed in New York, negotiations in New York can a be a sufficient, independent basis to establish jurisdiction under § 302(a)(1).  See, e.g., SAS Group, Inc. v. Worldwide Inventions, Inc., 245 F.Supp.2d 543, 548 (S.D.N.Y. 2003) ("[A]ny contract negotiations which indicate a purposeful invocation of the laws of New York State are transactions of business for purposes of New York's long arm statute . . . . It does not matter whether the negotiations are preliminary, whether the contract is executed in New York, or whether performance is contemplated for New York.") (citations and internal quotation marks omitted); see also Clarendon Nat. Ins. Co. v. Lan, 152 F.Supp.2d 506, 517 (S.D.N.Y. 2001) ("New York-based contractual negotiations can by themselves constitute the transaction of business in New York if they substantially advanced or were substantively important or essential to the formation of the contract so long as the negotiations relate to the same agreement that is the subject of plaintiff's lawsuit.") (citation, alterations, and internal quotation marks omitted).  Thus, Defendants transacted business in New York, whether the MSA was executed here or not, in "purposefully dedicat[ing] five months to negotiating the MSA and the interconnected model escrow legislation . . . in New York," Grand River, 425 F.3d at 167.

[13]Cutting Edge concentrates its jurisdictional argument on the Sherman Act claim because, as it readily admits, there is no independent subject matter jurisdiction over its state law

there must be 'a substantial nexus' between the transaction of business and the claim." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 105 (2d Cir. 2006) (citations omitted). "The inquiry is a fact-specific one," Sole Resort v. Allure Resorts Mgt., LLC, 450 F.3d 100, 103 (2d Cir. 2006), and, unfortunately, deciding whether the required nexus exists "is not an exact science." Antaeus Enterprises, Inc. v. SD-Barn Real Estate, LLC, 396 F.Supp.2d 408, 410 (S.D.N.Y. 2005).

Here, in support of its argument that its claim arises from the negotiation of the MSA, Cutting Edge relies solely on Grand River, claiming that it "controls the present case on the question of jurisdiction, and, as a result, very little additional analysis is needed." Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss (Mem. in Opposition) at 18. Cutting Edge argues that this is so because, as in Grand River, "this case involves allegations of an unlawful group boycott and conspiracy in restraint of trade" in violation of the Shearman Act. Id.

It is true that in Grand River, as here, the plaintiffs alleged, *inter alia*, violations of Section 1 of the Sherman Antitrust Act. Grand River, 425 F.3d at 164. There, the plaintiffs alleged that the Escrow Statutes and the MSA were themselves unlawful because together they constituted an overarching conspiracy that restrained trade in violation of the Sherman Act:

> [The complaint] goes on to state that '*[these] restraints and agreements* . . . constitute a contract, combination or conspiracy in restraint of trade.' These 'restraints and agreements' refer to the

---

breach of contract and tortuous interference claims, see Tr. at 58 (stating that these claims are pendent to the federal claims), and venue in this Court would be improper for the Constitutional claims if brought individually. Id. at 58-59. Thus, because "[i]t is the antitrust jurisdiction that places us here," id. at 59, this Court has jurisdiction over all Cutting Edge's claims only if it has personal jurisdiction over Defendants for the Sherman Act claim.

> MSA, as well as the Escrow and Contraband statutes. Thus, the appellant's attack on the Escrow Statutes is also plainly an attack on the MSA itself.

See id. at 167 (internal citation omitted) (emphasis in the original).

Put simply, the Grand River plaintiffs were directly attacking the legality of the very agreements that were negotiated in New York because, they alleged, those agreements created a system that frustrated the entrance into the cigarette market by non-OPMs and discouraged competition in that market. Therefore, plaintiff's claim directly "arose from" and had a "substantial nexus" to the transaction of business—the negotiation of the MSA—in New York. Id.

In this case, however, and unlike Grand River, Cutting Edge is not directly challenging the legality of the Directory Statutes or the MSA.[14] Rather, Cutting Edge alleges that Defendants have agreed not to certify any cigarette brands that are not listed on NAAG's website, that NAAG arbitrarily and capriciously refuses to list certain Cutting Edge brands and contact information on its website, and that this conduct "effectively enforce[s] a classic horizontal group boycott that restrains trade and harms competition . . . all in violation of the Sherman Act." Id. at ¶ 28. Thus, as Cutting Edge's own allegations make clear, its claim arises from this alleged agreement and conspiracy amongst Defendants not to list Cutting Edge brand cigarettes and contact information on State directories or NAAG's website, not from the MSA negotiations that occurred in New York. Nowhere does Cutting Edge allege that this conspiracy was entered into,

---

[14] In fact, when asked by this Court whether it was attacking the contraband/directory statutes, Cutting Edge's attorney answered: "No. We are attacking the enforcement." See Tr. at 49.

or carried out, in New York or that its ongoing prosecution is or has occurred in New York.[15]  In fact, Cutting Edge readily acknowledges that the "hub" of this alleged conspiracy is NAAG, which is located in Washington D.C.[16]

Moreover, and unlike the Escrow Statutes and the MSA that were challenged in Grand River, the Directory Statutes were not negotiated or executed in New York, and the MSA does not contain any model legislation.  Thus, while it might have been foreseeable that the defendants would have to come to New York to defend a lawsuit attacking the very agreements that they negotiated here, see Grand River, 425 F.3d at 167, it is not foreseeable that each individual Attorney General would be subject to suit in New York challenging the enforcement of his or her own state's Directory Statute.  The decisions whether or not to list Cutting Edge on the NAAG website, or on a particular state's directory, is not made in New York.  The claim challenging these decisions simply do not arise from the negotiation of the MSA in New York.[17]

---

[15]In fact, the Attorney General of the State of New York is not alleged to be a defendant in this action.

[16] See Mem. in Opposition at 12 ("NAAG is the hub of the conspiratorial wheel."); Tr. at 44 (stating that NAAG's website "is the hub of the agreement that violates the antitrust laws").

[17] At oral argument, Cutting Edge also argued that its cause of action arose from the negotiation of the MSA because the Directory Statutes are "part and parcel" of the MSA, citing Grand River, 425 F.3d at 167.  Tr. at 48.  The "part and parcel" language comes from Freedom Holdings Inc. v. Spitzer, 368 F.3d 149, 154 (2d Cir. 2004), which the court in Grand River cited when it interpreted plaintiffs' attack on the Escrow Statutes as attacks against the MSA itself. Grand River, 425 F.3d at 167.  In Freedom Holdings, however, the plaintiffs, similar to the plaintiffs in Grand River, alleged that the Directory Statutes, in conjunction with the MSA and Escrow Statutes, created an anti-competitive system designed to give OPMs power to set prices and share markets.  Id. at 152.  Thus, because the Directory and Escrow Statutes worked in conjunction with the MSA to create this allegedly anti-competitive environment, the court stated that the statutes were "part and parcel" of the MSA and therefore not immune from attack under antitrust laws.  Id. at 154.  But personal jurisdiction was not at issue in that case, and the court was not concerned with what activity occurred in New York.  So while the Directory Statutes might be "part and parcel" of MSA in the sense that they act together with the Escrow Statutes

Of course, there is some connection between Cutting Edge's claim and the negotiation of the MSA: if there were no negotiations, there would be no MSA and model escrow statute; if there were no MSA and model escrow statute, there would be no Escrow Statutes; if there were no Escrow Statutes, there would be no Directory Statutes; if there were no Directory Statutes, there would be no state directories; and if there were no state directories, there could be no alleged agreement amongst the Attorneys General not to list Cutting Edge brand cigarettes and contact information. But this connection is too tenuous and does not constitute a "substantial nexus" between the transaction of business in this state and the claims asserted.

Therefore, since Cutting Edge's Sherman Act claim does not "arise from" the transaction of business in New York, the requirements of N.Y. C.P.L.R. § 302(a)(1) have not been satisfied. This Court does not have personal jurisdiction over these Defendants.

## CONCLUSION

The motions to dismiss filed by defendants NAAG and the state Attorneys General are GRANTED. The amended complaint is DISMISSED.

Dated: New York, New York
       March 6, 2007

SO ORDERED:

*George B Daniels*
GEORGE B. DANIELS
United States District Judge

---

and the MSA to regulate the sale of cigarettes, they are not actually part of the MSA and their language was not negotiated during the MSA's negotiation. Cutting Edge is not challenging this regulatory scheme, as were the plaintiffs in Grand River. Nor are they challenging the MSA, the Escrow Statutes, or even the Directory Statutes. It's claims merely challenge how each of the Attorneys General are enforcing his or her own state's Directory Statute, which an insufficient, if any, connection to the negotiations that occurred in New York.

12